## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **BRENDA J. BROWN,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  7:19-cv-01138-RDP** |
| } | |
| **ANDREW SAUL, Commissioner,** } | |
| **Social Security Administration,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Brenda Brown[1] brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB"). *See also*, 42 U.S.C. § 405(g). Based on careful review of the record and briefs submitted by the parties, the decision of the Commissioner is due to be affirmed.

## I.   Proceedings Below

On January 19, 2017, Plaintiff filed a Title II application for a period of disability and DIB, alleging disability beginning December 2, 2016. (Tr. 223-226). Plaintiff's initial claim was denied on April 27, 2017. (Tr. 137-138, 146-150). Plaintiff requested a hearing to contest the denial. (Tr. 153-154). Plaintiff's request was granted and a video conference was held July 25, 2018 before ALJ Mary E. Helmer. (Tr. 69-99). Plaintiff, her attorney, and a vocational expert ("VE") attended the video hearing. (*Id.*). The ALJ affirmed denial of benefits in a decision dated October 30, 2018. (Tr. 50-68). After the Appeals Council denied Plaintiff's request for review on June 17, 2019, that

---

[1] Plaintiff was formerly known as Brenda McKanney.

decision became the final decision of the Commissioner and therefore a proper subject of this court's review. (Tr. 1-6). *See* 42 U.S.C. § 405(g).

## II.    Facts

Plaintiff was 45 years old when she filed for disability benefits. (Tr. 238). She claims she is disabled due to her rheumatoid arthritis ("RA"), osteoarthritis ("OA"), anxiety and depression, migraines, neuropathy, and endometriosis. (Tr. 69-99, 121-122, 137, 243, 253). She also complains of chronic back pain and ADHD. (Tr. 69-99). Plaintiff speaks English, has a high school education (plus some college), and last worked December 2, 2016. (Tr. 242-245, 255-262).

Plaintiff has worked at various jobs since the age of 16. (Tr. 227-228, 255-262, 301-303). And, from 2008 to 2016, she maintained nearly constant employment, frequently working more than one job. (*Id.*). Beginning in 1999, Plaintiff started working for Tuscaloosa City Schools as a special education paraprofessional. (Tr. 100-106, 227-228, 255-262, 301-303). Between 2001 and 2002, her position became full-time, and Plaintiff continued to work in that role until October 2014. (*Id.*). Plaintiff held three part-time jobs that overlapped with this period of full-time employment: home health aide/caregiver with Always There In-Home Care (from August 2006 to June 2015), group home staff with Petra, Inc. (from September 2008 to February 2009), and behavioral assistant at the Arts 'n Autism Special Education School (from August 2009 to April 2015). (*Id.*). As Plaintiff's condition began to worsen in 2014, she transitioned into a part-time substitute teacher role with Tuscaloosa City Schools (from May 2015 to October 2016), and worked full-time at the Brewer Porch Children's Center (from August 2015 to September 2016), where she provided mental health support to clients. (Tr. 103, 112, 255-262, 301-303). In November and December 2016, Plaintiff worked briefly as a shuttle driver for Rail and Road and

in retail and customer service for Reeds Jewelers. (Tr. 255-262). Since Plaintiff's purported onset date of December 2, 2016, Plaintiff has not worked, nor applied for any jobs. (Tr. 74).

Plaintiff stated she is "always in pain" and stated she does whatever she can to relieve it. (Tr. 85). In the one-story house where she lives with her brother, she "spend[s] 5-6 hours in bed [daily] due to pain [and] fatigue" and is constantly adjusting because of that. (Tr. 74, 84-85, 89-90, 263). Plaintiff describes an average day as going from the "bed to the recliner and going from the recliner to the bed," doctor appointments, and basic self-care in between. (Tr. 84, 92). Plaintiff alleges pain affects her sleep, and sometimes she goes "several nights at a time without sleep – tossing/turning in pain and coping with feelings of anxiety and stress." (Tr. 85, 264). Plaintiff can take showers, dress, use the bathroom, prepare meals, drive, and shop without assistance (usually once or twice per month). (Tr. 74, 83, 264-266). Plaintiff typically leaves home only for necessities and medical appointments. (Tr. 268). While at home, Plaintiff does only minor household chores because bending or twisting certain ways exacerbates her pain. (Tr. 85, 265-66). Plaintiff's sister-in-law helps with most household chores, including all "manual stuff," "hard cleaning," and lifting. (Tr. 85, 265-266, 271-278).

Plaintiff's primary disabling condition is RA, with symptoms first developing in her teenage years, as early as 1988.[2] (Tr. 75, 100-106, 377-379, 546-550).  Plaintiff states her "quality of life is just not what it would be if I did not have the RA." (Tr. 78). To treat her RA, she is prescribed Prednisone, Plaquenil, Mobic, Norco, a Lidocaine Patch and undergoes a Remicade Infusion every eight weeks. (Tr. 300). However, even with medication, Plaintiff claims she has

---

[2] Sometime between 1988 and 1991, Plaintiff's diagnosis was changed from Lupus (or SLE) to RA, and in a previous application the SSA awarded Plaintiff a period of disability and DIB due to her RA with an established onset date of April 1, 1991. (Tr. 75, 100-106, 377-379, 546-550). This finding of disability was upheld as recently as April 7, 2004, according to a Report of Continuing Disability Interview. (Tr. 100-106). However, Plaintiff ceased receiving these benefits "sometime in 2003 or 2004" due to her ability to perform and engage in substantial gainful activity during 2001 and subsequent years. (*Id.*).

constant "pain all over" and fatigue that "basically makes life unbearable." (Tr. 77). Plaintiff's RA causes constant joint swelling, and some joints feel better on some days but swelling in her knees (particularly her left knee) is constant. (Tr. 78). Plaintiff underwent a right hip replacement in 2001 associated with her RA (Tr. 103, 482, 547, 590, 674), and will likely need full replacement of her left knee (and potentially her right knee) in the future. (Tr. 103, 530-546). Plaintiff also complains of toe and hand deformities caused by the RA, which has affected her strength and "makes it very difficult" to grip and pick up items. (Tr. 77, 88).

Plaintiff is treated for her RA primarily by Dr. Henry Townsend of Rheumatology Associates, whose records span from 2013 to 2018. (Tr. 321-385, 503-525, 583-586, 635-653). Additionally, Plaintiff's primary care physician, Dr. Herman Fritz at the University of Alabama Medical Center ("UMC"),[3] has monitored and treated Plaintiff's RA in conjunction with Dr. Townsend. Dr. Fritz's records consistently note RA as one of Plaintiff's "chronic" conditions in records between 2013 and 2018. (Tr. 390-470, 654-687). Since 2013, Dr. Townsend has administered routine Remicade infusions to Plaintiff at eight-week intervals to treat her RA. (Tr. 114, 321-385, 503-525, 583-586, 635-653). At Plaintiff's initial visit, Dr. Townsend noted in his physical exam for the upper extremity:

> Mild soft tissue swelling of the wrists bilaterally, right greater than left. Moderate ulnar deviation of the MCP joints bilaterally, right greater than left. Mild tenderness of the wrists, CMP and PIP joints bilaterally. Good handgrip strength. Moderately reduced range of motion of the wrist. Elbows with full painless range of motion. Shoulders with full range of motion with mild crepitus and tenderness of the right shoulder.

(Tr. 378). Also during this visit, Dr. Townsend noted for Plaintiff's lower extremity: "Hips, knees, ankles and feet with good range of motion and no tenderness with motion or palpation." (*Id.*).

---

[3] Plaintiff would occasionally have appointments with medical professionals at UMC other than Dr. Fritz; however, Dr. Fritz remained Plaintiff's primary care physician throughout all UMC records. (Tr. 390-470, 654-687).

Plaintiff's gait and stance were noted to be within normal limits. (*Id.*). Neurologically, strength was 5/5 proximally and distally in the upper and lower extremities bilaterally. (*Id.*). These findings are largely consistent with treatment records through 2016, with occasional notes of varying levels of swelling, stiffness, tenderness or pain (particularly, increased knee pain). (Tr. 321-385). During this period, Dr. Townsend consistently noted Plaintiff "has done well with stable joint symptoms," "activities of daily living are carried out with minimal difficulty," tolerated medication well, and did not complain of any infusion side effects. (*Id.*). However, beginning in January 2017, Plaintiff began to complain of increasing and worsening knee pain, particularly in her left knee[4] (Tr. 503-525, 635-653), which reached a "break-though" level in March 2017.[5] (Tr. 510-512, 522-523).

Though Plaintiff's complaints persisted throughout 2017, the records also note that Plaintiff continually reported improved symptoms after each injection. (Tr. 503-525, 635-653). In May 2017, Plaintiff stated she was doing "fine" (Tr. 520), in June 2017 that she was "doing ok" (Tr. 518), and in October 2017 that she was doing "pretty well." (Tr. 650). In December 2017, Dr. Townsend noted, "Plaintiff reports her RA has been doing well since last visit with no significant join pain, stiffness, or swelling." (Tr. 637-640). Plaintiff also stated she was going to lose her insurance coverage at the end of the month, and the entry indicates she was "in communication with office billing staff to help with options." (*Id.*). And, in 2017, Dr. Townsend referred Plaintiff to Dr. Wayne McGough of Andrews Sports Medicine and Orthopaedic Center[6] for assessment and consultation regarding left knee arthroscopy. (Tr. 504-509, 516-521, 641-643, 652-653).

---

[4] On this date, Plaintiff also complained of hip and shoulder pain, as well as pain and occasional paresthesia in her feet. (Tr. 513-515). Paresthesia is commonly known as the temporary feeling of "pins and needles." *See* https://www.healthline.com/health/paresthesia. However, the record does not indicate complaints apart from knee pain were persistent. (Tr. 503-525, 635-653).

[5] On this date, Plaintiff also complained her pain and anxiety were affecting her sleep. (Tr. 510-512).

[6] Dr. McGough treated Plaintiff in September 2017 and diagnosed her with left knee end-stage varus primary osteoarthritis. (Tr. 530-546). He ordered Plaintiff to undergo an MRI and gave her a knee brace, and although he noted

Plaintiff complained of increasing and worsening knee pain in February and April 2018, and she reported improved symptoms after each injection. (Tr. 644-647). In February 2018, Plaintiff stated, "I am still trying to figure out my life," and in April 2018, Plaintiff stated she was "doing well," and "still working on my disability paper work." (Tr. 644-647). In February 2018, Dr. Townsend filled out a "Clinical Assessment of Pain" form at the request of Plaintiff's attorney. (Tr. 583-586). This "check the box" style form included the following judgments by Dr. Townsend as to the pain related to Plaintiff's condition:

> (1) pain is present to such an extent as to be distracting to adequate performance of daily activities and/or work, (2) [physical activity will result in] increase of pain to such an extent that bed rest and/or medication is necessary, (3) significant side effects [of prescribed medications] can be expected, which may limit the effectiveness of work duties or the performance of everyday tasks, (4) patient will be totally restricted and thus unable to function at a productive level at work [due to pain], (5) little improvement is expected in this case and the pain is likely to worsen with time, and (6) treatments [for pain] have had no appreciable effect or have only briefly altered the level of pain this patient experiences

(*Id.*). (quotations omitted).

Plaintiff also suffers from anxiety and depression, which in tandem, she considers her second most severe problem. (Tr. 79). Plaintiff first experienced these conditions in 2001, when she had a nervous breakdown, and she has been on various forms and dosages of anti-depressant medication ever since. (*Id.*). Since at least 2013, Plaintiff has been prescribed Lexapro and Xanax by Dr. Fritz. (Tr. 390-470, 587-634, 654-687). Plaintiff reports that the medication is generally unhelpful, and even with it, she has two or three panic attacks per month (with each attack lasting "no more than a few minutes") and episodes of unexplained crying and feelings of being withdrawn. (Tr. 79-80).

---

"the most definitive long-term treatment will be a total knee arthroplasty," he initially suggested nonoperative treatment. (*Id.*).

There are treatment records as early as May 2013 related to Plaintiff's anxiety and depression and those continue through May 2018. (Tr. 390-470, 587-634, 654-687, 699-710). In Dr. Fritz's earliest treatment record, "Anxiety state" is listed as a chronic condition and was so listed in each of the 14 treatment records through December 2017. (Tr. 390-470, 654-687). From May 2013 to October 2016, Dr. Fritz noted varying levels of anxiety, but generally affirmed the "continuation of initial symptoms." (*Id.*). However, in October 2016, Plaintiff's depression worsened, and screening indicated severe depression and a potential diagnosis of Major Depressive Disorder. (*Id.*). Plaintiff's anti-depressant medication dosage was increased, and she was referred to a clinical psychologist. (*Id.*).

Plaintiff's initial consult with Dr. Emily Lazenby of Psychiatry South occurred in April 2017. (Tr. 587-634). Dr. Lazenby's assessment was that Plaintiff suffered from generalized anxiety disorder ("GAD") and moderate/major recurrent depression ("MDD"). (*Id.*). Records from the initial consult indicate that Plaintiff thought prescribed medication was helpful and wished to continue using them. (*Id.*). Plaintiff's treatment plan included instructions to continue taking her medications, continue with therapy, and take advantage of psychiatric follow-up appointments. (*Id.*). Approximately every two weeks, Plaintiff attended therapy sessions through April 2018. (*Id.*). While these sessions yielded some positive results, in general, Plaintiff's complaints of depressed mood, anxiousness, and struggles with physical pain persisted. (Tr. 587-634, 699-710). In July 2017, "panic disorder" was added to the list of Plaintiff's conditions. (*Id.*). Plaintiff's reports of panic attacks were variable from month to month, but she reported that her symptoms were manageable through as-needed use of Alprazolam. (*Id.*). In October 2017, ADD/ADHD was also added to Plaintiff's list of conditions. (*Id.*). Plaintiff was prescribed Vyvanse for treatment, which she indicated helped her manage her symptoms. (*Id.*). The most recent psychiatric

evaluation, dated April 30, 2018, noted Plaintiff's GAD, ADHD, and panic disorder were all stable, though Plaintiff still suffered from some residual MDD symptoms. (*Id.*).

Plaintiff reported her third most severe condition was migraine headaches. (Tr. 80). Although her migraines only occurred "every other week or so," she claimed that when they did occur, they were severe and typically lasted "a few days." (Tr. 80-81). Plaintiff was treated for her migraines both by Dr. Fritz and Dr. Thomas Patton of Alabama Neurology & Sleep Medicine beginning in 2010. (Tr. 390-470, 552-582, 654-687). Plaintiff was first treated by Dr. Patton in July 2010, after reporting several severe migraines on a weekly basis. (Tr. 552-582). At the initial appointment, Dr. Patton diagnosed Plaintiff with a migraine variant, ordered a brain MRI, and prescribed Topamax. (*Id.*). Plaintiff underwent a brain MRI later in July 2010, which revealed nonspecific mild to moderate supratentorial white matter disease, but otherwise indicated normal results. (*Id.*). In both October 2010 and February 2011, Dr. Patton noted minimal progression in Plaintiff's condition, but continued to prescribe Topamax and ordered a second brain MRI. (*Id.*). This second MRI indicated no acute abnormality nor interval changes from the previous MRI. (*Id.*). Plaintiff did not return to Dr. Patton until April 2017. (*Id.*). But in the interim, she complained of experiencing migraines to varying degrees and Topamax was continuously prescribed throughout the 14 UMC treatment entries from 2013 to 2017. (Tr. 390-470, 654-687). When Plaintiff resumed treatment with Dr. Patton in April 2017, he noted Topamax "helps mildly," but that Plaintiff's migraines had persisted. (Tr. 552-582). In April, August, and December 2017, Dr. Patton increased Plaintiff's Topamax dosage in an effort to combat her migraines; however, as of the final record from December 2017, Plaintiff reported that her migraines remained painful and frequent. (*Id.*).

Plaintiff states that her neuropathy was diagnosed in 2016 and it caused her to suffer "really bad burning and pain in [her] feet." (Tr. 83). Plaintiff stated that she could walk for "maybe…ten minutes at most," and "standing for ten minutes…would be pushing it." (Tr. 84). Plaintiff's medical records indicate she first sought care from UMC with complaints of neuropathy in January 2017. (Tr. 390-470, 654-687). Plaintiff similarly discussed this with Dr. Townsend during the same month, and he noted Plaintiff's complaints of paresthesia in her feet – particularly while standing and walking. (Tr. 503-525). Both the UMC records and those of Dr. Townsend are void of any additional complaints of neuropathy before or after January 2017. (Tr. 321-385, 390-470, 503-525, 583-586, 635-687). However, Dr. Patton evaluated Plaintiff for similar complaints of numbness in April, August, and December 2017. (Tr. 552-582). Dr. Patton diagnosed Plaintiff with Lumbosacral Radiculopathy as early as October 2010 following the results of a July 2010 lumbar MRI.[7] (*Id*.).

In connection with her benefits application, Plaintiff underwent evaluations with consultive examiners Dr. Nathan Hewlett, Dr. Kathleen Ronan, and Dr. John Goff. (Tr. 473-486, 546-550). Dr. Hewlett performed an in-person consultative physical examination in March 2017. (Tr. 473-479). Prior to the examination, Dr. Hewlett reviewed Plaintiff's medical records and upon examination, diagnosed Plaintiff with RA, neuropathy, and depression/anxiety. (*Id*.). Notable objective findings included: ulnar deviation of the bilateral upper extremity digits with swan neck deformities of the fingers, crepitus in the left knee, limited range of motion of the lumbar spine and bilateral wrists, walking with antalgic gait with a left-sided limp, a positive supine straight leg

---

[7] Results of this MRI indicated that at L5-S1 there is Grade 1 anterolisthesis related to severe facet degenerative change. This is not significantly changed since 08/01/2001 except for a new 1 mm synovial cyst from the right facet joint, causing moderate right lateral recess narrowing with probable impingement of the right S1 nerve root. There is a disc bulge and facet degenerative change on the left causing mild lateral recess narrowing without convincing evidence of impingement. (Tr. 576). The results of this MRI were largely unchanged as compared to a previous scan in August 2008. (*Id*.).

test with pain (and negative test seated), but 4/5 strength throughout upper and lower extremities and no major concerns with grip strength. (*Id*.). Dr. Hewlett further noted Plaintiff entered and exited the room without difficulty, sat comfortably during the examination, got on and off the table on her own and removed and replaced her shoes independently. (*Id*.). Dr. Hewlett recommended no limitation on sitting, but a six-hour maximum for standing and walking, limited Plaintiff's lift/carry/push/pull capacity to 20 pounds occasionally and 14 pounds frequently, noted minor limitations for fine/gross manipulative activities and postural activities, found no limitations on hearing, traveling, speaking, working with chemicals or temperature extremes, but indicated there were limitations on working with heavy machinery and at unprotected heights. (*Id*.). All limitations were justified by limited range of motion in the lumbar spine and bilateral wrists, antalgic gait or ulnar deviation of the digits/swan neck deformities. (*Id*.)

Dr. Kathleen Ronan performed an in-person consultative psychological evaluation of Plaintiff on March 29, 2017. (Tr. 480-486). Prior to the examination, Dr. Ronan reviewed Plaintiff's medical records. (*Id*.). Her diagnostic impression of Plaintiff was she appeared to have anxiety and depression; maybe a pain disorder but further medical evaluation or documentation was needed to determine this; seemed to be a worrier, and although rather exacting and proper, there was not enough to diagnose a personality disorder. (Tr. 485). Plaintiff did "move, wince and shift as if in pain" during the evaluation, and Dr. Ronan indicated this pain may cause thought process, attention, and concentration variability. (Tr. 484). However, Dr. Ronan stated definitively that Plaintiff did not have ADHD. (*Id*.). In Dr. Ronan's opinion, Plaintiff could carry out both simple and complex instructions, but might struggle to recall them after 15 to 30 minutes; she could have mild trouble communicating with co-workers because of her conditions; and would likely have severe trouble managing work related stress. (Tr. 486). Dr. Ronan noted Plaintiff "is

in need of psychiatric referral to better address ongoing depression and anxiety, referral for individual therapy, and referral for pain evaluation and/or pain management." (*Id*.). If received, Dr. Ronan believed Plaintiff's "prognosis is fair for improvement" in connection with her anxiety and depression, assuming proper treatment (including therapy) in the next 12 months. (*Id*.).

Dr. John Goff also performed an in-person consultative phycological evaluation of Plaintiff on September 18, 2017. (Tr. 546-550). Dr. Goff concluded Plaintiff suffered from ADHD, Atypical Major Depressive Disorder and Pain Disorder.[8] (*Id*.). Dr. Goff noted Plaintiff "moved about" during the evaluation, which he attributed to his observations of Plaintiff's pain. (*Id*.). After a battery of tests, Dr. Goff found Plaintiff's processing speed score very low, possibly an indication of problems with attention but more likely related to discomfort in her hands. (*Id*.). The results also "suggest[] a person who is reporting marked distress with particular concern over her physical functioning." (Tr. 549). Dr. Goff also noted Plaintiff's physical conditions "may have left her tense, unhappy and [with] an impaired ability to concentrate or to perform in important life tasks." (*Id*.).

## III.   ALJ Decision

Disability under the Act is evaluated by a five-step sequential evaluation. 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). SGA may consist of "substantial work activity," which is work activity involving significant physical or mental activities, and/or "gainful work activity," which is work usually done for pay or profit. 20 C.F.R. § 404.1572(a-b). If an individual engages in SGA, the claimant is not considered disabled. 20 C.F.R. § 404.1520(b).

---

[8] More specifically, Dr. Goff classified Plaintiff's Pain Disorder as "Single Episode Continuous Pain Disorder with Psychological Features and associated with a General Medical Condition." (Tr. 550). The referenced general medical condition is Plaintiff's RA.

Second, the ALJ determines whether the claimant has a medically determinable impairment that is "severe" or a combination of medical impairments that are "severe." 20 C.F.R. 404.1520(c). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities. *Id*. *See also*, 20 C.F.R. § 404.1520(a)(4)(ii). Absent a severe impairment, a claimant is not considered disabled. 20 C.F.R. § 404.1520(a)(4)(ii).

Third, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet the criteria listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. If such criteria are met, and the criteria satisfies the duration requirement listed in 20 C.F.R. § 404.1509, the claimant is found to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.

Before proceeding to step four, the ALJ determines the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to do physical and mental work activities despite the limitations of the impairment(s). 20 C.F.R. § 404.1520(e). An RFC determination is based upon all the relevant medical and other evidence contained in the case file. *Id*. *See* 20 C.F.R. § 404.1545. Using the RFC assessment, the ALJ proceeds to step four, determining whether the claimant has the necessary RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do past relevant work, the claimant is not considered disabled. *Id*.

If a claimant is unable to perform past relevant work, the analysis proceeds to step five, where the ALJ again uses the RFC assessment, along with considerations of the claimant's age, education and work experience, to determine whether the claimant can make adjustments to perform other commensurate work. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines the

claimant is able to make adjustments and do other work, she is not disabled. *Id*. In order to support a finding of not disabled at this step, the burden of proof shifts to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here at step one, the ALJ determined Plaintiff had not engaged in SGA since December 2, 2016, her alleged onset date of disability. (Tr. 50-68). At step two, the ALJ determined Plaintiff suffered from several impairments: RA, depression, anxiety, OA of the left knee, hip replacement, degenerative facet changes of the lumbar spine, and migraine headaches. (*Id.*).

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meet or medically equal the listings of 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. (*Id.*). As to Plaintiff's physical impairments (those associated with RA, OA and hip replacement), the ALJ determined those impairments did not meet or medically equal the listings or 1.02 (for major dysfunction of joint(s), 1.03 (for reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), or 14.09 (for inflammatory arthritis). (*Id.*).  In reaching this conclusion, the ALJ pointed to Plaintiff's ability to effectively ambulate and perform fine and gross motor movements in each upper extremity. (*Id.*). As to Plaintiff's spinal impairment (degenerative facet changes of the lumbar spine), the ALJ determined the condition did not meet or medically equal the listing for 1.04 (disorders of the spine). (*Id.*). In reaching this conclusion, the ALJ noted Plaintiff does not have a positive straight leg raise test (both sitting and supine), and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in psuedoclaudication. (*Id.*).

As to mental impairments, the ALJ determined Plaintiff's conditions (depression and anxiety) did not meet the listing of 12.04 (depressive, bipolar and related disorders) or 12.06

(anxiety and obsessive-compulsive disorders), and the Paragraph B criteria were unsatisfied. (*Id*.). Although the ALJ noted moderate limitations in understanding, remembering or applying information, mild limitations in interacting with others, moderate limitations in ability to concentrate, persist or maintain pace, and moderate limitations in adaption and management of self, she determined Paragraph B criteria was unsatisfied because Plaintiff's impairments do not satisfy at least two of the "marked" limitations or one "extreme" limitation. (*Id*.).

The ALJ determined Plaintiff had the RFC to:

> perform a range of light work, with no more than occasional pushing or pulling of arm controls, no operation of foot controls; no more than occasional climbing ramps and stairs; never climbing ladders, ropes scaffolds; never kneeling, crouching, crawling; frequent use of the hands bilaterally for gross and fine manipulation, avoid concentrated exposure to extreme cold and extreme humidity; avoid all exposure to excessive vibration, unprotected heights, and hazardous machinery; limited to unskilled work or the ability to attend and concentrate for 2 hour periods, few if any work place changes, ability to make simple work related decisions, work should be goal oriented and is precluded from production pace or assembly line paced work, work that can be around coworkers throughout the day but with only occasional interaction with coworkers, stand and walking is limited to no more than four hours, sitting up to six hours per day

(Tr. 58). Based upon this finding, the ALJ determined Plaintiff was unable to perform any past relevant work. (Tr. 62).

Considering Plaintiff's RFC, age, work experience and education, the ALJ determined several jobs exist in the national economy that Plaintiff could perform currently and/or could make successful adjustments to perform. (Tr. 63). Relying upon the expert testimony of the VE, the ALJ determined Plaintiff could work as a hand packager, small parts assembler, or a laundry folder. The ALJ further determined the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id*.). Based upon this evidence, the ALJ determined Plaintiff was "not disabled" within the framework of the Act. (Tr. 64).

14

**IV.     Plaintiff's Argument for Remand or Reversal**

Plaintiff argues that substantial evidence does not support the ALJ's findings, and that the ALJ committed reversible error by failing to properly evaluate the opinion evidence of Dr. Townsend, Dr. Hewlett, Dr. Ronan, and Dr. Goff.  (Doc. # 9 at 6). Further, Plaintiff argues the ALJ did not properly evaluate the evidence at step five because "the ALJ failed to identify and resolve conflicts between the VE testimony and the DOT," thereby breaching her duty to develop a full and fair record. (Doc. # 11 at 7).

**V.      Standard of Review**

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and

determine if the decision is reasonable and supported by substantial evidence. *See Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

## VI.    Discussion

Plaintiff first argues the ALJ failed to properly evaluate the opinions of Dr. Townsend, Dr. Hewlett, Dr. Ronan, and Dr. Goff. (Docs. # 9, 11). Plaintiff argues that if these opinions (particularly, Dr. Townsend's) had been given proper weight, substantial evidence does not support the denial of benefits. Second, Plaintiff argues the ALJ erred at step five. The court addresses Plaintiff's arguments below.

### A.    The Opinion of Dr. Townsend was Properly Evaluated by the ALJ

Plaintiff first (and primarily) argues the ALJ failed to give proper consideration to an opinion of Dr. Townsend, Plaintiff's treating Rheumatologist, that was provided on a check-the-box form. (Doc. # 9 at 7-10; Doc. # 11 at 1-6) (Tr. 321-385, 503-525, 583-586, 635-653). Plaintiff argues that the ALJ's decision to assign little weight to that opinion was "not supported by the objective evidence … and offering a sampling of cherry-picked record citations to support her conclusion." (Doc. # 9 at 8).  Rather, Plaintiff argues Dr. Townsend's opinion should have been assigned controlling weight, and that the ALJ's failure to do so was in error and inconsistent with the pertinent regulations. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). (*Id.*). That is, Plaintiff contends that "[i]f the ALJ followed the regulations and gave proper consideration to Dr. Townsend's opinion, there simply is not substantial evidence supporting the Commissioner's decision." (Doc. # 11 at 3). As a result of this failure, Plaintiff contends she should be found disabled. (Doc. # 9 at 8). The court disagrees.

The regulations promulgated under the Social Security Act establish the standard for evaluating medical opinion evidence. *See* 20 C.F.R. §§ 404.1527, 416.927. Regardless of source,

the Commissioner "will evaluate every medical opinion" received. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, not all medical opinions and sources are equivalent. Medical source opinions from treating sources are generally entitled to greater weight, "since these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

As a general rule, the opinion of a treating source is typically given "controlling weight" when supported by the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, in the Eleventh Circuit, "controlling weight" need not be given to a treating physician's opinion, if there is "good cause" shown for rejecting it. *Stewart v. Comm'r of the SSA*, 746 Fed. App'x. 851, 854 (11th Cir. 2018). *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary") (citations omitted). *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ that discredits or assigns less weight to a treating source's opinion for good cause "must state reasons for doing so with particularity, and the failure to do so is reversible error." *Stewart*, 746 Fed. App'x. at 855 (citations omitted). Such "good cause" may exist when a treating source's opinion is not "bolstered by the evidence," "where the evidence support[s] a contrary finding," or when "opinions [are] conclusory or inconsistent with [the source's] own medical records." *Lewis*, 125 F.3d at 1440. So long as a specific justification is provided, it is not this court's role to "second guess the ALJ about the weight the treating physician's opinion deserves." *Hunter v. SSA*, 808 F.3d 818, 823 (11th Cir. 2015).

Further, certain medical source opinions are reserved for the Commissioner, such that they do not constitute medical opinions nor receive any heightened weight. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). This includes opinions "that would direct the determination or decision of disability," as well as assessment of RFC and application of vocational factors. *Id*.

As Plaintiff's treating Rheumatologist, Dr. Townsend's opinion would typically be given controlling (or at least substantial) weight. *See* 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). However, the ALJ determined there was "good cause" to discredit Dr. Townsend's opinion, particularly those stated in the Clinical Assessment of Pain Form, because these opinions were unsupported by the objective evidence and Plaintiff's own treatment records. (Tr. 59-60).

The Clinical Assessment of Pain Form is a check-the-box styled form dated February 6, 2018, which was submitted at the request of Plaintiff's attorney. (Tr. 583-586). It includes the following judgments by Dr. Townsend as to Plaintiff's condition and pain:

> (1) pain is present to such an extent as to be distracting to adequate performance of daily activities and/or work, (2) [physical activity will result in] increase of pain to such an extent that bed rest and/or medication is necessary, (3) significant side effects [of prescribed medications] can be expected, which may limit the effectiveness of work duties or the performance of everyday tasks, (4) patient will be totally restricted and thus unable to function at a productive level at work [due to pain], (5) little improvement is expected in this case and the pain is likely to worsen with time, and (6) treatments [for pain] have had no appreciable effect or have only briefly altered the level of pain this patient experiences

(Tr. 584-585) (quotations omitted). The ALJ specifically pointed to Plaintiff's treatment records from August and December 2017 (Tr. 635-653), which were two of the three most recent treatment dates prior to the submission of the form, as conflicting with the opinion provided on the form. (Tr. 59-60). In December 2017, Plaintiff "reports her RA has been doing well since last visit with no significant joint pain, stiffness, or swelling from RA." (Tr. 59-60, 635-653). The ALJ further pointed to reports of "good grip strength" and "good range of motion" in the hips, ankles and feet

on both treatment dates, and noted Plaintiff's complaints of increasing knee pain, mild crepitus and knee tenderness. (*Id.*). Because the ALJ determined the objective medical records from these dates were inconsistent with Dr. Townsend's opinions in the Clinical Assessment of Pain Form, and because the ALJ adequately described her rationale for discounting those opinions, the ALJ did not err in assigning Dr. Townsend's opinion little weight.

Finally, the types of judgments made by Dr. Townsend in the "Clinical Assessment of Pain" form are opinions reserved for the ALJ because they would seek to "direct determination or decision of disability." *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). The form concludes pain would prevent ability to work and pain would result in inability to function at a productive level at work. (Tr. 583-586). Because these judgments are expressly reserved to the ALJ, they are not entitled to any heightened weight solely because they were provided by a treating physician.

### B.     Dr. Hewlett's Opinion was Properly Evaluated by the ALJ

Plaintiff next argues that the opinion of Dr. Hewlett was given inappropriate weight by the ALJ, especially when considering that Dr. Townsend's opinion was given little weight. (Doc. # 9 at 10-11). As a one-time consultative examiner, Plaintiff asserts Dr. Hewlett has "only a snapshot view of [her] impairments," and that by giving greater weight to his opinion than that of Dr. Townsend, Plaintiff's treating physician, the ALJ's rationale is inconsistent with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). (*Id.*). Plaintiff's argument is off the mark.

Plaintiff is of course generally correct that a treating physician's opinion should be afforded greater weight than that of a consultative examiner. *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (citations omitted). *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). However, in the present case, Dr. Townsend's opinions expressed in the Clinical Assessment of

Pain Form were discounted for good cause on the basis that they were inconsistent with Dr. Townsend's own objective records. *Lewis*, 125 F.3d at 1440.

Dr. Hewlett performed an in-person consultative physical examination of Plaintiff in March 2017, diagnosing Plaintiff with RA, Neuropathy, and Depression/Anxiety. (Tr. 473-479). The ALJ noted several observations made by Dr. Hewlett, including Plaintiff's entry and exit of the room without difficulty, independently taking her shoes off and putting them back on without difficulty, and getting on and off the examination table without assistance. (Tr. 60, 471). Dr. Hewlett also noted a positive straight leg test in the supine position (but negative in the seated position). (Tr. 478). The ALJ also pointed to Dr. Hewlett's functional assessment, which was consistent with light physical exertion with frequent fine and gross activities. (Tr. 60, 479). Dr. Hewlett opined Plaintiff could stand or walk for up to six hours, justifying the limitation as due to "antalgic gait and limited range of motion of the lumbar spine," but had no limitations on sitting. (*Id*.).

Considering these findings along with the record as a whole, the ALJ determined Dr. Hewlett's opinion to be consistent with the evidence and assigned it great weight. (Tr. 60). Dr. Hewlett's diagnoses are also consistent with the records of Dr. Fritz, Dr. Patton, Dr. Ronan, Dr. Goff, and Dr. Townsend (with the exception of the check-the-box Clinical Assessment of Pain Form). (Tr. 321-385, 390-470, 473-486, 503-525, 546-550, 583-687, 699-710). As such, the ALJ did not err in the weight given to Dr. Hewlett's opinion.

### C.    The Opinion of Dr. Goff was Properly Evaluated

Plaintiff also disputes the ALJ's assignment of only partial weight to Dr. Goff's opinion as "relatively consistent" with the record; rather, she argues that Dr. Goff's opinion is fully consistent

with her psychological treatment history, and is not merely "a snapshot of one appointment." (Doc. # 9 at 13).

Dr. Goff performed an in-person consultative phycological evaluation of Plaintiff on September 18, 2017, and concluded Plaintiff suffered from ADHD, Atypical Major Depressive Disorder, and Pain Disorder.[9] (Tr. 546-550). This diagnosis was noted by the ALJ in the decision to assign partial weight. (Tr. 61-62). The ALJ also reiterated Dr. Goff's opinion that Plaintiff's anxiety may be related to her physical condition and that medication (or lack thereof) may have had an effect on her performance on the tests conducted during the examination. (Tr. 61-62, 546-550). Dr. Goff additionally noted that Plaintiff's low processing speed was "likely related to problems with the pain in her hands, [which] we can tell by looking at... are probably somewhat painful." (Tr. 546-550). However, this observation was accompanied by a caveat in his recommendations: "A clarification on her medical condition would be helpful to me in making a determination as to whether or not there is a possible direct effect of her physical condition on her cognition." (*Id.*). Dr. Goff's uncertainty and request for clarification were also noted by the ALJ (Tr. 62). There is no dispute over Dr. Goff's diagnosis. Rather, Plaintiff focuses on his speculation. The ALJ's decision to discredit the speculative cause, while crediting the diagnosis itself is supported by substantial evidence. Therefore, the proper standards were applied in assigning Dr. Goff's opinion partial weight.

**D.     The Opinion of Dr. Ronan was Properly Evaluated**

Plaintiff next argues the ALJ erred by assigning little weight to the opinion of Dr. Kathleen Ronan and contends that "the overwhelming evidence of record is consistent with Dr. Ronan's

_____

[9] Dr. Goff classified Plaintiff's Pain Disorder as "Single Episode Continuous Pain Disorder with Psychological Features and associated with a General Medical Condition." (Tr. 550). The referenced general medical condition is Plaintiff's RA. (*Id.*).

opinion" and "support[s] a finding that [Plaintiff] is severely impaired in her ability to perform basic mental demands for even unskilled work." (Doc. # 9 at 11-12). The ALJ assigned Dr. Ronan's opinion little weight finding that "it is not support[ed] by the longitudinal history of the treatment records." (Tr. 61).

Dr. Ronan performed an in-person consultative psychological evaluation of Plaintiff on March 29, 2017. (Tr. 480-486). Dr. Ronan diagnosed Plaintiff with depression and anxiety, and though no specific cause was identified, much of Dr. Ronan's opinion attributes Plaintiff's limitations to somatic symptoms and pain. (*Id*.). During the exam, Dr. Ronan observed Plaintiff would "move, wince and shift as if in pain" and "rubbed her legs in pain." (*Id*.). The ALJ reiterated similar observations, noting "Dr. Ronan stated [Plaintiff's] attention and concentration was a little variable due to pain and worries," and "[Plaintiff] appeared to have depression and anxiety that appeared related to her being a worrier, bearing chronic pain and having some coping limitations." (Tr. 57, 61). The ALJ also noted Dr. Ronan's opinion that Plaintiff could carry out both simple and complex instructions but might struggle to recall them after 15 to 30 minutes, she could have mild trouble communicating with co-workers because of her conditions, and would likely have severe trouble managing work related stress. (*Id*.).

In deciding to assign little weight to Dr. Ronan's opinion, the ALJ looked particularly at Dr. Townsend's treatment records from December 2017 (the most recent treatment notes prior to Dr. Ronan's evaluation) where Plaintiff reported no significant joint pain. (Tr. 635-653). Because these records contradicted Dr. Ronan's attribution of Plaintiff's condition to her purported pain, the ALJ reasonably determined her observations to be unsupported by the longitudinal history. (Tr. 61). As such, the ALJ's decision to assign little weight to Dr. Ronan's opinion was not in error.

**E.      The ALJ Did Not Err at Step Five**

Finally, Plaintiff argues the ALJ failed to meet her burden at step five by failing to show the existence, in significant numbers, of jobs in the national economy that she can perform. *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c). Plaintiff contends that the ALJ erred in two ways: first, the ALJ listed a specific representative occupation (laundry folder) that is inconsistent with the RFC; and second, the ALJ failed to define "production pace" in the stated limitations, such that it was "too vague to appropriately evaluate whether the RFC and [the occupations of hand packager and small parts assembler] cited by the VE are supported by substantial evidence." (Doc. # 9 at 15).

At step five it is the ALJ's burden, among other things, to make findings about the existence of jobs that a claimant can perform based upon the claimant's RFC. 20 C.F.R. §§ 404.1520(g), 404.1560(c). The ALJ may consider VE testimony in making these findings; however, the ultimate determination of whether such jobs exist is a decision reserved for the ALJ. *See Brooks v. Barnhart*, 133 F. App'x 669, 670 (11th Cir. 2005) (citations omitted). *See* 20 C.F.R. § 1566(e). Often, an ALJ will use VE testimony as a guidepost in determining if there are a significant numbers of jobs in the national economy, which is defined as "in the region where the claimant lives or in several other regions of the country." 20 C.F.R. § 404.1566(a). *See Brooks*, 133 F. App'x at 670 (citation omitted). The number of jobs that constitute a "significant" number is not a bright line value. *Compare Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 positions locally, 1,600 statewide and 80,000 nationwide constitutes a significant number), *with Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015) (440 positions statewide and 23,800

23

nationwide constitutes a significant number), *and Brooks*, 133 F. App'x at 671 (840 positions nationwide constitutes a significant number).

In the Eleventh Circuit, a VE's testimony cannot be solely relied upon by an ALJ and the ALJ has an affirmative obligation to identify and resolve apparent conflicts between the Dictionary of Occupational Titles ("DOT") and VE testimony. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018) ("If a conflict is reasonably ascertainable or evident, the ALJ is required to identify it, ask about it, and resolve it in his opinion. We take the word "apparent" to mean "seeming real or true, but not necessarily so" (citation omitted)). However, the ALJ should not "draw inferences about job requirements that are unsupported by the DOT's text" in seeking to resolve a conflict. *Christmas v. Comm'r of Soc. Sec.*, 791 F. App'x 854, 857 (11th Cir. 2019).

During Plaintiff's hearing, the ALJ posed hypotheticals to the VE based upon Plaintiff's already-determined RFC. (Tr. 69-99). Among Plaintiff's stated limitations were that she was to "avoid concentrated exposure to extreme cold and extreme humidity" and was precluded from "production pace or assembly line pace work." (*Id.*). Based upon the hypothetical questions posed to the VE, the representative occupations of hand packager (79,000 positions nationwide), small parts assembler (49,000 positions nationwide), and laundry folder (111,000 positions nationwide) were offered by the VE. (*Id.*). The VE also offered unskilled sedentary jobs of document preparer (92,000 positions nationwide), final assembler (25,000 positions nationwide), and order clerk (19,000 positions nationwide). (*Id.*). In response to inquiries from the ALJ, the VE affirmed that her testimony was consistent with the DOT, noted that Plaintiff's stated mental limitations would not hinder her ability to perform the duties of the stated positions, and stated the sedentary jobs would have "no more than frequent fine and gross manipulation." (*Id.*).

Plaintiff asserts that conflicts exist between the DOT and VE testimony and that the ALJ was required to resolve those but failed to do so. (Doc. # 9 at 14-16). These conflicts relate to the occupations of laundry folder, hand packager, and small parts assembler, which combined account for 239,000 jobs in the national economy which Plaintiff could perform. (Tr. 63, 69-99).

Plaintiff's argument relating to the occupation of laundry folder is based upon the stated limitation "to avoid concentrated exposure to extreme cold and extreme humidity." (*Id*.). Plaintiff asserts that under the Characteristics of Occupations Defined in the DOT, the position of "laundry folder requires constant … exposure to humidity." (Doc. # 9 at 15). Her argument is wide of the target.

Plaintiff conflates the terms "constant" exposure to humidity referenced in the Characteristics of Occupations Defined in the DOT with "concentrated" exposure. 369.687-018 Folder, DICOT 369.687-018. Those key words -- constant and concentrated -- are not equivalent. The ALJ simply was not required to resolve a non-existent conflict. Further, the DOT references "extreme" heat, but not "extreme" cold, neither of which are constant (under the DOT) nor "concentrated." *Id*. Plaintiff's attempt to restate the phrasing of the DOT in favorable terms does not create a conflict, and the ALJ did not err by not inferring one. Thus, the representative occupation of laundry folder offered by the VE is consistent with the DOT and presented no conflict.

Due to the fact that the laundry folder occupation is one which Plaintiff is able to perform, the ALJ's step five findings were appropriate. But even if Plaintiff's arguments with regard to the definition of "production pace" had merit (they do not), that would not indicate any error here. The laundry folder occupation represents a potential of 111,000 jobs in the national economy on its own, and that easily satisfies a "significant" number of jobs in the Eleventh Circuit. *See Allen*, 816

F.2d at 602; *Atha*, 616 at 935; *Brooks*, 133 F. App'x at 671. Therefore, the court need not reach the merits of Plaintiff's secondary argument.

## VII.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed.  A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this June 9, 2021.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE